Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Telephone:    (206) 294-1348
Facsimile:    (206) 957-9549

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CN and CANDACE WUEST,

      Plaintiffs,

  v.

META PLATFORMS, INC., formerly
known as FACEBOOK, INC.,

      Defendant.

Case No. _____

COMPLAINT FOR PERSONAL
INJURIES

JURY DEMAND

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

  Plaintiffs CN and her mother, Candace Wuest, bring this action for personal injury and loss of consortium against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") (collectively, "Meta"), and allege as follows:

## I.  INTRODUCTION

**A. Plaintiffs' Claims**

  1.  This product liability action seeks to hold Defendant Meta's Instagram product responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the

children and teenagers of the United States by Meta and, specifically for the injuries it caused CN beginning in 2016, when CN was only twelve years old. Those injuries, proximately caused by Meta's unreasonably dangerous Instagram social media product, include but are not limited to addiction, anxiety, depression, eating disorders, suicide attempts, and long-term mental and physical harms that will forever impact CN's life.

2.      Meta's Instagram social media product likewise caused foreseeable harms to Plaintiff Candace Wuest. Candace took affirmative steps to protect her daughter and was unaware that Meta's Instagram product was addictive and harmful. Candace was emotionally, financially, and physically harmed by Meta's addictive design and its continued development and distribution of inherently harmful and dangerous social media products to her child. Moreover, the harms suffered by Candace Wuest—and millions of other parents across the U.S.—were not just foreseeable but, in many cases, Meta anticipated that these precise harms would happen to some portion Instagram users and their families because of Meta's product design and decisions.

3.      Plaintiffs' harms were all caused by CN's exposure to and use of Meta's unreasonably dangerous and defective social media product, Instagram. CN was 12 years old when she opened her first Instagram account, which was initially used for safety and communication purposes. However, Meta's addictive design, harmful social comparison product features, and engagement-based recommendation systems led CN down a deadly rabbit hole. In Meta's own words, it created a "perfect storm" of addiction, social comparison, and exposure to incredibly harmful content and product features, then operated its algorithms to push and promote harmful content via CN's Feed, Explore, Stories, and Reels features.

4.      At all times relevant to this complaint, Meta programmed and operated its product to prioritize engagement over user safety. Meta put its profits ahead of human life in a deliberate and systematic manner, pushing forward with its engagement-first business model even when Meta's own research confirmed that its product design and selected system settings were exposing children like CN to incredible harms, to the point of causing and/or contributing to suicide in a profoundly significant number of young Instagram users.

5.      Plaintiffs suffered several emotional, physical, and financial harms as a result—all

of which are a symptom of the current health crisis among American youth caused by certain harmful social media products, specifically in this case, Instagram.

**B.     Meta's Internal Documents Targeting Children**

6.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). The Facebook Papers prove known dangerous designs and design defects.

7.     The Facebook Papers prove that Meta was aware of the harms its Instagram product was causing and made calculated business decisions to reject reasonable safety recommendations, based on Meta's determination that making its product safer for children and teens would result in decreased engagement and advertising revenue. At all times relevant to this case, Meta knew that children like CN and parents like Candace Wuest would be harmed because of its Instagram product and in the precise manner CN and Candace Wuest were harmed. Meta leadership repeatedly made the deliberate decision to stay the course with their addictive and inherently dangerous and defective products, to the detriment of millions of American teens and families.

8.     The Facebook Papers have been referred to in published articles and there are many examples of the Facebook Papers themselves being published, with more being published every day. The following are just two examples,

9.     The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

> a.     Social Comparison: Topics, celebrities, Like counts, selfies [Jan 2021 internal document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

b. <u>Appearance-based Social Comparison on Instagram</u> [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

c. <u>Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues</u> [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

d. <u>Teen Mental Health Deep Dive</u> [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

e. <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].

10. Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

a. Why We Build Feeds

b. Is Ranking Good

c. Big Levers Ranking Experiment

d. [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

e. MSI Metric Note Series

f. The Meaningful Social Interactions Metric Revisited: Part 2

g. The Meaningful Social Interactions Metric Revisited: Part 4

h. The Meaningful Social Interactions Metric Revisited: Part 5

i. Meaningful Social Interactions Useful Links

j. MSI Documentation

---

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

k.  Evaluating MSI Metric Changes with a Comment-Level Survey

l.  Surveying The 2018 Relevance Ranking Holdout

m.  Overview of MSI + Pages and Survey Research

n.  Is Multi-Group Picker "Spammy?"

o.  Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

p.  [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

q.  Planned MSI Metric Changes in 2020

r.  MSI Metric Changes for 2020 H1

s.  Should We Reduce the MSI Weight of Sticker Comments?

t.  Max Reshare Depth Experiment

u.  "Understand This Post's Ranking" —How I Miss Thee!

v.  Facebook and Responsibility

w.  The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.  One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.  News Feed UXR Quarterly Insights Roundup

z.  What Happens If We Delete Ranked Feed?

aa. News Feed Research: Looking Back on H2 2020

bb. Content from "Political" Pages in In-Feed Recommendations

cc. Political Content in In-Feed Recommendations (IFR)

dd. In-Feed Recommendations HPM —April 15 2021

These documents and all other Facebook Papers that come to light after the filing of this Complaint are incorporated by reference into this Complaint. The sole reason Plaintiffs do not attach all such documents is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claims and Plaintiffs believe that the public has a right to know.

11.     On information and belief, Meta has knowledge about the harms its products cause users, particularly teen, child, and other vulnerable user populations, and continues to operate those products in a harmful and dangerous manner anyway and in the interest of competitive advantage and increasing its already astronomical profits. Moreover, only a small fraction of relevant Meta documents has been disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what Meta done in the name of corporate greed.

12.     Meta has actual knowledge that children under the age of 13 are using its social media products; that its social media products are highly addictive and harmful to a significant population of all users, but especially teens and children; that certain design features that serve no functional, informational, societal, or educational purpose (for example, "likes") are causing harm to users, but especially teens and children; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed. Meta knew about these harms, could have made its Instagram product safer at minimal expense, and opted to stay the course instead and to increase user engagement and already astronomical revenue.

13.     Despite knowledge of the dangerous and harmful characteristics of its product, Meta has made and continues to make calculated cost-benefit business decisions and is consistently prioritizing their already astronomical profits over human life.

14.     The harms at issue in this case all arise from Defendants' product designs and/or inadequate warnings.

## C.     The Social Media Epidemic Among Children

15.     On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146

percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Meta.

16.     The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit, the Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

17.     By 2018, an estimated 63% of all children in the United States aged 13 to 14 and 78% of all children in the United States aged 15 to 17 used Instagram specifically. Current estimates put the total number of all US teens using Instagram at 76%.

18.     Current estimates put the number of teen Instagram users in the US over 20 million – in other words, there are more than 20 million at-risk teen Instagram users in the U.S. alone.

D.     **Disparities Between Meta's Public Statements and Internal Research on Harm to Children**

19.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as the cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Again, Meta has spent years publicly denying these findings—while internally confirming them.

20.     Specifically, Meta leadership has vehemently denied that its products are harmful or addictive. Meta has gone to great lengths to assure the world that its social media products are safe. Even its Terms of Use (effective January 4, 2022) represent that Meta is "Fostering a positive, inclusive, and safe environment," and that Meta uses its "teams and systems … to combat abuse

and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." (Effective January 4, 2022). However, Meta's own internal research and "experiments" show the opposite. The Facebook Papers include years' worth of studies and reports, often referred to by Meta as "experiments," discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and what Meta refers to as Suicide and Self Injury (or, SSI). The following are just a few examples.

21.     The Facebook Papers, however, include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See, supra*, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," p. 29 (referring to its own product mechanics as "addicting."

---

[3] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf

*Id*. at p. 29, 30. More to the point, Meta knows that "Aspects of Instagram exacerbate each other to create a perfect storm." *Id*. at p. 33 and 34. According to Meta, the "social comparison sweet

spot" (*id*.)—a place of considerable harm to users, particularly teens and teen girls—lies at the center of Meta's product model and product features,





*Id*. at p. 33 and 34.

22. The user harms acknowledged in these slides relate, ultimately, to Meta product features like "Feed + Profile and Explore" (*id*.), filters, and teen-targeted marketing and accessibility. Meta refers to its "product mechanics" as "addicting" and recognizes that it is not certain body-focused celebrity content shown on Instagram causing harm, but rather, the sheer volume at which Meta's social media product identifies and targets individual users (in particular,

teen girls) with that body-focused content. Indeed, this is not even content these users have searched for or, in many cases, want to see – but rather, it is content (including advertisements) Meta itself has programmed its product, algorithms, and other technologies to target at individual users as a means of increasing engagement and addiction; and, in turn, Meta's revenue and competitive positioning.  Meta knows exactly the harms that its products are causing to its teen users, yet Meta leadership has made the decision to stay focused on engagement and growth, at the expense of safety (aptly referred to by Meta as "Integrity").

23.    Meta also knows that its recommendations and other product features, like Feed and Explore, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women (known as "algorithmic bias" and/or "algorithmic discrimination")/ Yet Meta continues to reap astronomical profits at the expense of these users.

24.    To name only one example, Meta knows that its algorithm is identifying and pushing harmful social comparison content to teen <u>girls</u> at significantly higher rates than what it is identifying and pushing to teen <u>boys</u>. Meta's algorithm is discriminating in a manner that disproportionally targets girls between the ages of 13 and 17, as compared to similarly situated boys between the ages of 13 and 17. And Meta has no intention of stopping, because this discrimination has proven lucrative and until it is more expense for Meta to keep discriminating against young women it will continue to do so.

25.    In the words of the Facebook Whistleblower, Meta is "morally bankrupt."

26.    Meta knows of several other product features that are harming its users, and which Meta could reasonably make safer – but where Meta has chosen engagement and growth over integrity every time. Another example is the "friend" recommendation product feature, which is a feature Meta has in both its Facebook and Instagram social media products. Meta knows that this feature is harmful to children in that it contributes to a significant amount of the grooming and exploitation that occurs on and because of Meta's platforms. In other words, Meta affirmatively directs and connects predatory adult users who do not know and would not be able to find minors otherwise to Meta's minor users via its recommendation algorithms, and vice versa (directing minors to adult users). Meta is aware of the harm this product is causing to a substantial number

of its minor users. However, Meta has refused to simply turn this function off for minor users – which it can easily do – because of other and more general findings that the more connections Meta can make for new users, the more likely those users are to keep using its product.

27.     Meta's own research has also been quite conclusive in determining that its teen, female users are disproportionately impacted by these products features and resulting harms,



*Id*. at p. 9.

28.     According to an article published by the Wall Street Journal,[4]

> For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.
>
> "We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.
>
> "Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."
>
> Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

---

[4] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

29.     Meta documents also discuss the fact that "Constant comparison on Instagram is 'the reason' why there are higher levels of anxiety and depression in young people,"



**Teens blame Instagram for increases in the rates of anxiety and depression among teens**

- This reaction was unprompted and consistent across all groups
- Constant comparison on Instagram is "the reason" why there are higher levels of anxiety and depression in young people
- Social comparison and perfectionism are nothing new, but young people are dealing with this on an unprecedented scale.
- The proliferation of new and different ways to compare themselves to others, combined with constant access to means that there is no way to escape social comparison on IG.
- For both boys and girls, this was called out as being the number one reason why IG is worse than other platforms for mental health. And, young people openly attribute their increased level of anxiety and depression to Instagram.

*"The reason why our generation is so messed up and has higher anxiety and depression than our parents is because we have to deal with social media. Everyone feels like they have to be perfect."*
*- UK Female*

*See, supra,* "Teen Mental Health Deep Dive," p. 27.  (October 10, 2019), at p. 53. As illustrated in the Facebook Papers, this constant and harmful social comparison is the result of social media's design and operation, and not any one piece of content or interaction on its platform

30.     Meta documents also report that 13.5% of teen girls on Instagram say that the platform makes thoughts of Suicide and Self Injury (SSI) worse; while 17% of teen girls on Instagram say that the platform makes "Eating Issues" (*e.g.* anorexia and bulimia) worse,

*See*, https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/, Slide 14 of "Hard life moment – mental health deep dive."

31.    Meta knows that its product is contributing to teen depression, anxiety, even suicide and self-harm. Why doesn't it change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Meta's priority is growth and competition concerns, and it sees "acquiring and retaining" teens as essential to its survival. As made clear in the Facebook Papers, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns Meta links to addiction), represent Meta's greatest (if not only) growth opportunity in the US, and can be used by Meta to recruit older and younger family members and friends.

32.    Meta also knows that its Instagram product is widely used by pre-teens under the age of 13. Despite it being illegal for Meta to knowingly permit persons under the age of 13 to use its platform, Meta has spent millions (if not billions) of dollars over the last decade studying "tweens" to determine how to make its product more appealing to and increase engagement among them. Meta sees children under 13 as a tappable and valuable market, which it must capture and use to increase revenue and ensure competitive positioning in the long-term.

33.    For Meta, young users are a priority demographic, and Meta leadership will do anything to increase and maintain engagement. Indeed, on October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[5]

34.    Meta spends billions on these efforts, going so far as to identify vulnerabilities and other areas where it can adjust its products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

35.    Identified among Meta's internal documents are other product features that cause harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[6]

36.    In May 2022, Instagram head Adam Mosseri told reporters that that research he had seen suggests the app's effects on teen well-being is likely "quite small."[7] Upon information and belief, Mr. Mosseri's statement was false and Meta leadership, including Mr. Mosseri, has been made aware of the significant and far-reaching effects of Instagram on teen well-being.

---

[5] https://www.nytimes.com/2021/10/16/technology/instagram-teens.html

[6] *See https://www.nytimes.com/2020/01/17/business/instagram-likes.html*

[7] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

> The features that Instagram identifies as most harmful to teens appear to be at the platform's core.
>
> The tendency to share only the best moments, a pressure to look perfect and an addictive product can send teens spiraling toward eating disorders, an unhealthy sense of their own bodies and depression, March 2020 internal research states. It warns that the Explore page, which serves users photos and videos curated by an algorithm, can send users deep into content that can be harmful.
>
> "Aspects of Instagram exacerbate each other to create a perfect storm," the research states.
>
> The research has been reviewed by top Facebook executives, and was cited in a 2020 presentation given to Mr. Zuckerberg, according to the documents.

*See* https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739 (to name only one example).

37.     In a more recent interview, Mr. Mosseri said that some features of Instagram could be harmful to some users, and they aren't easily addressed.[8] This statement was also false, as Meta's leadership, including Mr. Mosseri, have been presented with numerous recommendations from Meta's employees and even teens themselves as to how they could easily make the Instagram product safer for children and teens. Examples of this include but are not limited to things such as,

a.   Verification of age and identify for all users.

b.   Email verification for all users.

c.   Not allowing multiple accounts.

d.   Not allowing public profiles for minors, or defaulting minors to private ones.

e.   Not allowing direct messaging with minors, or not allowing direct messaging with minors and persons not on their "friends" list.

f.   Turning off recommendation algorithms for minor accounts.

g.   Turning off content algorithms for minor accounts.

h.   Reducing amount of certain content categories Meta's algorithms identify and direct to minor users (where Meta has determined that even a small reduction to quantity would have a large impact for users, and where Meta can make such a change essentially by turning a level on its current settings).

i.   Not creating, approving, and directing harmful advertisements to minors.

---

[8] *Id.*

    j.   Adoption of SSI (Suicide and Self-Injury) tools Meta employees have recommended and, again, that Meta could implement on a unilateral basis and that would reduce the incidence of SSI caused by Instagram.

38.    Meta knows that teens are more vulnerable and suffer harms from use of the Instagram social media product at higher rates than adult Instagram users. At the same time, however, teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to child and teens so Meta, in turn, works hard to make its Instagram social media product as appealing to teens as possible, even though it is harmful to teens.

**E.    Meta's Singular Focus on Profits Over Safety**

39.    Meta knows the harmful impact its products have. Instead of warning users and/or re-designing its product to make it safer, however, Meta senior leadership conducts extensive economic calculations and chooses enhancing profits over protecting human life.

40.    Meta knows that large numbers of its users are "addicted" to its social media products. Indeed, the problematic use identified in medical literature is precisely the type of use Meta has designed its product to encourage through psychological manipulation techniques— sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

41.    Meta also slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users.

42.    Meta likewise knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens. Meta has tested and proved these theories and is aware of product fixes that would cost Meta virtually nothing but that, in turn, would reduce the harms to Meta's teen users – users like CN. But Meta leadership refused such changes due to the potential for decreased revenues from advertisers and influencers. In other words, Meta made a calculated business decision and chose profits over human life.

43.    Meta likewise engages in a constant cost-benefit analysis when it comes to user safety vs. engagement—with engagement winning every time. For example, Meta does not

incorporate reasonable and necessary safety protocols and checks into its design and development processes. It also then fails to make its product and product features safer after concerns are voiced and/or actual harms are known. It opts instead for profits and engagement, consistent with its well-known motto, "Move fast and break things." On information and belief, there will be multiple examples of this once discovery is had in this case.

44.    One example of this is document titled "Facebook and Responsibility," in which a Meta employee writes "Actively ranking content in News Feed and promoting content on recommendations surfaces makes us responsible for any harm caused by exposure to that content," and "We should be just as concerned about our failures to address harmful content as we are about collateral damage from false positives …"—i.e. the degree to which users are harmed by having their content mistakenly identified as violating and taken down. *See, supra*, published at https://www.documentcloud.org/documents/21594152-tier2_rank_other_0320.



## TL;DR

- Actively ranking content in News Feed and promoting content on recommendations surfaces makes us responsible for any harm caused by exposure to that content.
- A majority of users view Facebook as responsible for moderating content on its platform.
- We should be just as concerned about our failures to address harmful content as we are about collateral damage from false positives and demotion policies should be set according to cost/benefit tradeoffs for users.
- There is room for additional and/or stronger integrity enforcements to reduce viewership of harmful content.

## What responsibility does Facebook bear for the content users see on Facebook?

The main keys to responsibility are the **actions that we choose to take** and the **actions that we are capable of taking**. This note is a review of internal and external research addressing Facebook's perceived responsibility for moderating content on its platform. Two perspectives are worth considering: the **responsibility Facebook actually bears** and **users' perceptions of Facebook's responsibility**.

## Responsibility from the ethicists' point of view

Chats

REDACTED FOR CONGRESS

Facebook is most active in delivering content to users on recommendation surfaces like "Pages you may like," "Groups you should join," and suggested videos on Watch. These are surfaces where Facebook delivers unconnected content. Users don't opt-in to these experiences by following other users or Pages. Instead, Facebook is actively presenting these experiences, and according to ethicists, is therefore entirely responsible if these experiences are harmful. Here, many ethicists would advocate a policy of "first, do no harm." With millions of positive and valuable Pages, Groups, and videos on Facebook, there's really no excuse for recommending harmful content. In this spirit, Facebook's new non-recommendable content policies aim to more-aggressively remove harmful content from recommendation surfaces, including the removal of "borderline" content from these surfaces (wiki, post).

News Feed ranking is another way Facebook becomes actively involved in these harmful experiences. Of course users also play an active role in determining the content they are connected to through feed, by choosing who to friend and follow. Still, when and whether a user sees a piece of content is also partly determined by the ranking scores our algorithms assign, which are ultimately under our control. This means, according to ethicists, **Facebook is always at least partially responsible for any harmful experiences on News Feed.**

FOR CONGRESS

> **We are just as responsible for our failures to address harmful content as we are for false positives.** To minimize our responsibility for harm caused to users by content on Facebook, demotion thresholds and strengths should be based on a cost-benefit analysis of user value that weights false negative rates against false positive rates, and the harms experienced by users from exposures and integrity actions. Generally, we should be as aggressive as possible in enforcing against harmful content without depriving people of valuable or important content.
>
> Currently, there are places where it appears we could be doing more to prevent users from being exposed to harmful content, yet don't. For instance, the Feed Enforcement team recently launched a new class of "p(violating)" demotions. These are demotions where the strength of the demotion is designed to be proportional to the probability that a content violates a Community Standard: a post with a 10% probability is demoted 10%, another with a 50% probability of violating is demoted at 50%, and so forth. A 50% demotion cuts a posts' ranking score in half, so in order to appear before another, a post with 50% demotion would have to have originally had twice its score. And a post with a 99% demotion would have to have originally had 100 times its ranking score. However, we currently cap p(violating) demotions at 50% strength. This is because we are not transparent with the posters of demoted content, so the worry is that a 99% demotion might be equivalent to a "shadow ban," reducing viewership nearly as much as a removal, but without any transparency or recourse for the poster. These transparency concerns are clearly legitimate, but it means there will be cases where we are 99% certain a post is violating, yet we nevertheless continue showing it in users' Feeds because we are only demoting it at 50%. One solution might be to complement p(violating) demotions with warning screen treatments for highly-probable violations.

45.     In other words, Meta is perfectly capable of enforcing its own Terms of Service, Community Standards, and other guidelines. It can adjust controls in a manner that would better protect its users, especially children and teens, from certain, significant harms caused by Meta's user setting options, recommendations, and other algorithmic-driven product features. Yet, Meta repeatedly conducts its engagement-driven, cost-benefit analysis and repeatedly chooses profit over human life. That is not a choice Meta has the right to make.

46.     Nor does Meta intend to make the changes necessary to protect young users. For example, after the Facebook Whistleblower came forward and the first products liability lawsuits were filed, Meta began making small product changes, in an effort to mimize the impact of the truth about the harmfulness of its products. But Meta's new claims of prioritizing user safety are as false as the prior ones. The following are just some examples.

47.     Meta now claims that it requires age verification, which claim is misleading. Meta simply asks its users to input their birthdate, as it did upon opening of the account. This form of "verification" is no more effective than it was the first time. Meta is unwilling to actually verify age and identification, however, as this would prevent anyone under the age of 16 from opening

an account without parental consent and would stop those same users from opening multiple accounts – which would have significant impact on Meta's engagement numbers and resulting revenue. It would also decrease engagement among predatory users, as many would not sign up for fear of getting caught and those who did would be easier to identify.

48.   Meta also claims that it has parental controls in place, which "parental controls" Meta knows to be ineffective. For example,

   a.   Parental controls do not work when users open accounts without their parents' knowledge or consent (which is many if not most teen users);

   b.   Parental controls do not work when users open FINSTAS (or secret, secondary accounts) which their parents do not know about, which again, refers to more than half of all teens using Meta's Instagram product.

   c.   Parental controls do not work because, as Meta also knows, most parents do not understand how to use Meta's social media products in the first place, and cannot or do not use what they do not understand. *See, supra,* "Teen Mental Health Deep Dive" (p. 50),



## At the same time, parents can't understand and don't know how to help

- Today's parents came of age in a time before smartphones and social media, but social media has fundamentally changed the landscape of adolescence.
- Social media amplifies many of the age-old challenges of being a teenager.
- The always-on nature of social media means that teens' social lives have infiltrated into every part of life without a break.
- Sharing more parts of life means more points of comparison.

*"Talking to your family doesn't help because they can't understand and don't get what you need. How are you going to tell the people who literally gave you life that you don't want it anymore?"*
- UK Female

That is, actual user safety requires implementing more than just a tool aimed at putting safety in the hands of parents, since most do not understand the tool or know it exists in the first place.

d.   Whatever the reason for parents not using parental controls, that misses the point entirely – which is that Meta does not have the right to distribute inherently dangerous and defective products to children in the first place, and parental controls do not address harmful product features like algorithms and social comparison content, to name a few.

## F.    Overview of Claims

49.    Plaintiffs bring claims of strict liability based upon Meta's defective design of its Instagram social media product that renders such product not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Meta's product with a negligible increase in production cost. In fact, Meta's employees have made proposals for product changes time and time again, as is also proven by Meta's internal documents, only for Meta controlling shareholder and CEO Mark Zuckerberg to refuse such changes based solely on the potential impact they might have to Meta's engagement and revenue numbers. The following is from a Wall Street Journal article published September 15, 2021,[9]

> Anna Stepanov, who led a team addressing those issues, presented Mr. Zuckerberg with several proposed changes meant to address the proliferation of false and divisive content on the platform, according to an April 2020 internal memo she wrote about the briefing. One such change would have taken away a boost the algorithm gave to content most likely to be reshared by long chains of users.
>
> "Mark doesn't think we could go broad" with the change, she wrote to colleagues after the meeting. Mr. Zuckerberg said he was open to testing the approach, she said, but "We wouldn't launch if there was a material tradeoff with MSI impact."

50.    What's clear from all of these reports and documents is that Meta and its

---

[9] https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215

competitors in the social media space *could* provide social media products that do not promote or amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of dollars in revenue.

51.　Meta has consistently and knowingly placed its own profit over the health and welfare of its teen and child users, recognizing astronomical gains at their expense.

52.　Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of its Instagram social media product. The addictive quality of Instagram and its harmful algorithms are unknown to minor users and their parents.

53.　Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous Instagram social media product and its failure to warn of such dangers. Meta knew, or in the exercise or ordinary care should have known, that its social media product was harmful to a significant percentage of its minor users and failed to redesign its product to ameliorate these harms. Meta also failed to warn minor users and their parents of foreseeable dangers arising out of use of its Instagram product.

54.　Meta's own former and/or current developers often do not allow their own children and teenagers to use the Instagram product.[10] For many years, Meta has had actual knowledge that its Instagram social media product is dangerous and harmful to children but actively concealed these facts from the public and government regulators and failed to warn parents about this known harm for continued economic gain.

55.　Plaintiffs also bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, et seq. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

56.　Plaintiffs also bring a claim for unjust enrichment. Defendant received a direct benefit from CN's problematic and harmful use of its product, both from the amount of time she spent on Instagram and from her creation of multiple accounts. Under the circumstances stated

---

[10] *See*, *e.g.*, https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

herein, it would be unjust and inequitable for Defendant to retain those ill-gotten benefits.

57.     Plaintiffs bring a claim for invasion of privacy under California law. Defendant's conduct detailed herein frustrated and intruded upon Candace Wuest's fundamental parental rights to protect her child and to monitor and control her child's use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

58.     Finally, Plaintiffs bring claims for fraud and fraudulent concealment. Meta spent years lying to Congress and the public about the nature of its products and harms they cause. Meta made affirmative statements and material omissions of fact designed to lull potential users into trusting that their social media products were safe, and that Meta was prioritizing user safety over its own profits. Meta not only knew that these statements were false but was actively concealing the truth by creating a corporate culture of fear—conscientious Meta employees were made to believe that they would be ruined and not believed, and that their actions would result in others not being able to make Meta's products safer if they revealed the truth. Meta knew that its products were not safe, and knew that children, like CN, would be harmed by their use.

59.     Plaintiffs' claims do not arise from third party content, but rather, Meta's product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity, put minor users in contact with dangerous adult predators, and otherwise prioritize engagement (and Meta profits) over user safety.

## II.     PARTIES

60.     Plaintiffs CN, and her parent Candace Wuest, reside in Independence, Kentucky. CN opened her first Instagram account when she was about 12 years old. Upon information and belief, Meta required her to assent to its Terms of Service at that time. CN is still a minor, no longer uses the Instagram social media product, and disaffirms any contractual terms Meta might claim.

61.     Defendant Meta is a Delaware corporation with its principal place of business in Menlo Park, California. Meta owns and operates the Facebook and Instagram social media platforms, applications that are widely available to users throughout the United States.

### III.    JURISDICTION AND VENUE

62.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Meta are residents of different states.

63.     This Court has general jurisdiction over Defendant Meta because Meta's principal place of business is California and Meta is "at home" in this State. This Court also has specific jurisdiction over Meta because Plaintiffs' claims set forth herein arise out of and relate to Meta's activities in the State of California.

64.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Meta resides in the Northern District of California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS RELATING TO PRODUCT DEFECTS

**A.    Facebook and Instagram Background**

65.     Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

66.     Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

**News Feed Product**

67.     Both the Facebook and Instagram products show users a "feed." A user's "feed" is

a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

68.     Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

69.     Over time, Meta "slowly switched" its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though Meta knows that maximizing sessions is harmful to its users.

70.     Recommendation-based feeds and product features also promote harmful content, particularly where, as in the case of Meta, the algorithm is being programmed to prioritize number of interactions and not quality of interactions.

71.     Meta exerts an unprecedented level of manipulation and control over its users and is knowingly directing harmful content to users as a matter of its algorithmic programming and settings Meta chooses as part of its prioritization of engagement over user safety. Meta has dozens of studies confirming these allegations.

72.     Over the years, Meta employees have offered countless suggestions and recommendations as to product changes Meta could make to better protect its users from the harms Meta products cause. And over the years, Meta leadership has declined, delayed, or outright ignored the vast majority of those in favor of its own financial and growth-related interests.

73.     In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

"Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."

Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."

The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.

In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.

According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.

Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.

"We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli.

74. And again, Meta's recommendations are not coincidence, nor are they the product of third-party speech or even Meta's speech. Meta is exerting a degree of manipulation and control over its users via its unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Moreover, Meta is not targeting millions, thousands, or even hundreds of users with its product. Meta's technologies allow it to target every single user (billions of people) simultaneously and on an individual basis, which fact makes its algorithmic and social media products far more dangerous than anything American courts and lawmakers have ever seen or could even have conceived of until Meta's internal

documents were released in late 2021. Even now, there are tens of thousands if not millions of additional Meta documents and data sources that the world will need to see to fully appreciate and understand how Meta's products function and what Meta (and its primary competitors in the social media industry) have knowingly done to our children and teens.

75.     Meta not only tracks user actions, it tracks every conceivable detail of usage, including intentional vs. nonintentional actions, every message sent and received, every like, detailed usage and engagement and growth statistics *for every single user*, which data Meta can then access, organize, and utilize based on date, location, and age. In short, and upon information and belief, Meta's systems provide Meta with actual knowledge as to virtually everything that occurs on its platform.

76.     Meta is willing to addict its users if it means Meta's own long-term success.

77.     Meta has had almost a decade to fix the type of product defects identified Senators Richard Blumenthal, Marsha Blackburn and Mike Lee in late 2021, but has not—instead, its products have severely harmed millions of teens in the U.S. alone, including CN.

### Explore Product

78.     Instagram has a search feature, called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta designed and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.



*See, supra*, "Teen Mental Health Deep Dive," p. 54.

79.     Meta also has conducted studies to identify precisely which of its algorithmically promoted content is most harmful to users, and the degree of harm that content causes. *See, e.g.*, *supra*, "Social Comparison: Topics, celebrities, Like counts, selfies" and "Appearance-based Social Comparison on Instagram." Despite being able to identify the harmful categories, as well as volume and amplification product defects causing harm, Meta ultimately determined that its promotion of such content is a large part of what makes the Instagram product appealing to teens. Meta decided against changing its current product as a result, and irrespective of identified harms.

80.     Meta also knows that these harms (caused by Instagram) disproportionately impact protected groups, including young women; and that its product disproportionately targets protected groups, including young women.

**Profile Settings**

81.     Instagram profile default settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users.

82.     Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increases user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Meta is aware of the harm and previously opted to not make necessary and cost-effective changes to prevent it.

**Direct Messaging Product Feature and Access to "Vulnerable" Users**

83.     Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens.

84.     Meta's direct messaging feature is where most unwanted interactions happen, including bullying and sexual exploitation of minors, which Meta knows, yet it has once again opted to not make necessary and cost-effective changes to prevent these harms – opting for engagement over safety.

**Push Notifications and Emails**

85.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its Instagram product. Based on individualized data Meta collects, it then selects content and notification frequency for its users and notifies them via text and email. Instagram's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

86.     Upon information and belief, Meta has programmed its systems such that its programs send more of these notifications to its most addicted users, knowing that these users are the ones who have a harder time resisting the allure of this product feature.

**Reels and Stories**

87.     Instagram has also added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories." These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective.

88.     To name only one example, Meta has not yet implemented certain, basic safety-related technologies across all product features – despite public representations to the contrary – while the algorithmic bias it operates within its algorithms is identifying and promoting these inherently riskier products in greater numbers to teens, women, and other minority groups. This means, for example, that Meta is identifying and recommending harmful and eating-disorder promoting content to young girls in higher numbers – as it did with CN. This is content these users would never have seen but for Meta's identification and promotion, which harms Meta knew about but did nothing to correct as it prioritized keeping the attention of those teen users.

**Marketing to Kids and Social Comparison Product Features**

89.     Instagram also incorporates several unique product features that serve no functional purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). Meta knows that these product features disproportionally harm teen girls and young women, yet Meta leadership—singularly focused on its economic bottom line—rejects product change recommendations that would have better protected users against these harms and at minimal implementation cost to Meta.

90.     Another example involves Meta's "like" button feature. Meta has determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[11] What is surprising, however, is that Meta identified the harmful feature (the "like" button), is aware of a low to no-cost solution that would reduce the harms to its users, and still made the business

---

[11] *See, e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

decision to *not* launch that product fix.  This is another blatant example of Meta choosing profits over human life and, specifically, the health and well-being of teens.

91.     Upon information and belief, multiple Meta employees recommended and/or supported the launch of this product change for the Instagram product, but Meta leadership said no. And this specific feature was a source of significant emotional and mental harm to CN.

**Meta's Ownership and/or Licensing Rights in all User Content**

92.     Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs, or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

93.     Meta also has legal rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[12]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

---

[12] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

94.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

- **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

95.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

96.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

97.     Meta's products are used by many millions of children every day.

**B.     Meta's Instagram Application is a Product**

98.     There can be no dispute that Meta designs, manufactures, and distributes Instagram. Meta refers to Instagram and its various product features internally and in public facing documents as a "product."

99.     Meta's Instagram product is designed to be used by minors and is actively marketed to teens across the United States.

100.     Meta has obtained countless patents in connection with its Instagram product, which legal protection it would not be entitled to for mere editorial decisions.

101.     The Instagram product is designed to be used by minors and is actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design. In addition, Meta works with and actively encourage advertisers to create ads targeted at

and appealing to teens, and even to children under the age of 13. Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance.

102.    Meta also is aware that large numbers of children under the age of 18 use its product without parental consent. Indeed, Meta designs its social media product in a manner intended to allow and not prevent such use.

103.    Meta is likewise aware that large numbers of children under the age of 13 use its product despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their product in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase its own profits.

C.    **Meta Knows That Its Facebook and Instagram Products are Highly Addictive**

104.    Meta and its leadership have repeatedly represented to the public and governments around the world that their Instagram and Facebook products are safe and not addictive.

105.    In September of 2017, Meta CEO Mark Zuckerberg spoke out on the issue of opioid addiction, making general addiction-related statements, including that "Communities all across the country have a long road ahead, but as someone told me at the end, 'I'm hopeful because we're talking about it.' Me too."[13]

106.    In April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

---

[13] https://www.northpointrecovery.com/blog/mark-zuckerberg-discusses-view-addiction-facebook/

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[14]

107.    In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[15]

108.    In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.

He was asked:

> "So Mr. Zuckerberg, yes or no: Do you agree too much time in front of screens, passively consuming content, is harmful to children's mental health? ..."

He responded:

> "I don't think that the research is conclusive on that…"

He was asked:

> "Do you agree that you make money off of creating an addiction to your platforms?"

He responded:

> "Congressman, no. I don't agree with that."

He was asked:

> "Do you believe that your platform harms children?"

He responded:

> "Congresswoman, I don't believe so.  This is something that we study and we care a lot about; designing products that  peoples' well-being is very important to us.  And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are older than that. And again, our policies on the main apps that we offer generally prohibit people under the age of 13 from using the services."[16]

109.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive. She testified that she "disagree[d] with calling

---

[14] https://www.youtube.com/watch?v=AB4mB-K7-xY

[15] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[16] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

our product addictive. I also think that's not how we build products."[17] She denied Meta's marketing to children under 13, repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[18]

110.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive.[19] He testified that teens come to Instagram while dealing with difficult things and that Instagram makes things better for them. Mr. Mosseri downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[20] Indeed, he testified that Meta's overarching goal is child safety: "But I want to assure you that we do have the same goal. We want all teens to be safe online."[21]

111.    In truth, Meta has been studying its "addicting" product mechanics for years, and Meta leadership—including and specifically Meta CEO Mark Zuckerberg—had actual knowledge that these products are addictive and harmful to children and teens. Moreover, Meta's own estimates reflect known addiction by a significant number of children and teens. For example, if we assume an addiction rate among US teen users only of 3%—which is *far lower* than Meta's estimated—that means that more than *half a million* American teenagers (age 13 to 17) are currently addicted to Instagram to the point where their addiction is causing sleep deprivation, actively interfering in their friendships, family relationships, employment, and education, and is

---

[17] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[18] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[19] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[20] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[21] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

1 causing other physical and emotional harms.

2      112.    In March of 2020, Meta internally published a document titled "Social Comparison

3 Exploratory Research" (*see, supra*, as published by WSJ) based on a US Exploratory Study it

4 conducted titled "Teen Girls Body Image and Social Comparison on Instagram,"

## Teen Girls Body Image and Social Comparison on Instagram - An Exploratory Study in the US

We conducted focus groups and diary study in the US to better understand teen girls' experience with appearance comparison on social media and how this impacted their body image and overall mental health.

9      113.    In that document, Meta refers to its Instagram product mechanics as "addicting,"

### Instagram
- Forget it's a highlight, reel vs. real
- Product mechanics (addicting)
- Explore, discover, stalk (down the rabbit hole)
- Sport – 1 hour to edit image/caption, then monitor "likes"

*Id*. at p. 29.

16      114.    Among the published Facebook Papers are other documents detailing studies

17 specific to the issue of teen users and mental health, including the fact that teens "have an addicts'

18 narrative about their use – it can make them feel good, feel bad. They wish they could spend less

19 time caring about it, but they can't help themselves …" and "Teens recognize the amount of time

20 they spend online isn't good for them but at the same time they know they lack the willpower to

21 control the time spent themselves."



*See, supra*, "Teen Mental Health Deep Dive," p. 53.

115.    In short, Meta employees and Meta leadership know that Instagram is addictive and harmful, in part, because it was designed that way (addictive design) and, also, because the billions of dollars Meta has spent researching user addiction has said so. Meta has never released this information on addiction and/or problematic use to the public; instead, its leadership lied repeatedly to Congress and the parents of its tens of millions of child and teen users.

116.    Meta advertises its product as "free," because they do not charge its users for downloading or using its product. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users under the age of 18. Meta also receives revenue from selling its users' data to third parties.

117.    The amount of revenue Meta receives is based upon the amount of time and user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta opted for user engagement over the truth and user safety.

118.    Instagram is built around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users'

susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" in Stories). This design is unreasonably dangerous to the mental well-being of underage users' developing minds.

119.    Meta has also employed thousands of engineers to help make its products maximally addicting. One example is Instagram's "pull to refresh" feature, which is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities.

120.    Meta knows that is product is addictive, and it knows that millions of teen users want to stop using Instagram but cannot.

121.    Meta does not warn users of the addictive design of its product. On the contrary, Meta actively conceals the dangerous and addictive nature of its product, lulling users and parents into a false sense of security. This includes consistently playing down its products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make its research public or available to academics or lawmakers who have asked for it.

122.    For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November of 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attended and even presented at an annual conference held in Silicon Valley called the Habit Summit, which started in 2014 and ran until recently, and the primary purpose of the Summit was to learn how to make products more habit forming.

123.    Meta's Terms of Use also state that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." Yet, as seen in FBP 09/15 ("Exposure to integrity harms is a worse experience than 'Over-enforcement'" (March 31, 2020), at p. 2), and elsewhere, this is not the truth. Meta *does* have the technology needed to protect its users, but only employs that technology when and to the extent it can do so

without decreasing user engagement and its own profits (or unless a "press fire" forces them to act).

124.    Meta also engineers its product to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

125.    Meta spends billions of dollars marketing its products to minors, and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

**D.    Meta Has Designed Complex Algorithms to Addict Teen Users and Its Business Model is Based on Maximizing User Screen Time**

126.    Meta has intentionally designed its product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to the largest technology companies in the world.

127.    Meta has designed and progressively modified its product to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. More specifically, Meta knows that many teens feel as though they cannot stop their use of Meta's product, even though they want to stop. *See,* Section B, *supra*.

128.    One of these features, present in Instagram, is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Meta is well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health. However, this type of use allows Meta to display more advertisements and obtain more revenue.

129.    Meta has also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Meta knows to be harmful to its users. This is content that users might otherwise never see but for Meta's affirmative pushing of such content to their accounts.

130.    In the words of another, high-level departing Meta employee,

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[22]

131.    The addictive nature of Meta's product and the complex and psychologically manipulative design of its algorithms is unknown to ordinary users.

132.    Meta goes to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making knowingly false public statements about the safety of its product.

133.    Meta also has developed unique product features that are designed to limit, and that do limit, parents' ability to monitor and prevent problematic use by their children.

134.    Meta's addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta has addicted its user and is then able to influence user preferences, its algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Meta's algorithm design will promote elephant content to User One and moonbeam content to User Two. Meta's above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users—as long as those promotions increaser user engagement.

---

[22] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

**E.**  **Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

135.     The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

136.     The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

137.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

138.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

139.     The algorithms in Meta's social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency

caused by users' incomplete brain development. Meta knows that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Meta has failed to design its product with any protections to account for and ameliorate the psychosocial immaturity of its minor users. On the contrary, Meta specifically designs its product with these vulnerabilities in mind.

**F.     Meta Misrepresents the Addictive Design and Effects of its Social Media Product**

140.    At all times relevant, Meta has advertised and represented that its product is appropriate for use by teens and has stated in public comments that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

141.    Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users, like CN. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product.

**G.     Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Meta Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

142.    Plaintiffs seeks to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as the designer and marketer of dangerously defective social media products, as well as Meta's own statements and actions, not as the speaker or publisher of third-party content.

143.    Meta has designed its product to be addictive. For example, Meta has developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Meta's algorithm even calculates the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Meta's social media product, which also—as Meta knows—are the times that their health and well-being necessitate them not being on Meta's social media product. Meta's product is designed to and does addict users on a content neutral basis.

144.    Meta's algorithm structure is by itself harmful to users, again, irrespective of content. For example, a primary purpose of Meta's algorithm design is to determine individual user preferences first so that Meta can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

145.    It is clear from Meta's records that Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

146.    On a content neutral basis, the manipulation and control Meta knowingly wields over its users daily is profoundly dangerous.

147.    Meta's Integrity Team employees regularly provide Meta leadership with warnings and recommendations, which Meta leadership regularly ignores. As explained in the employee departure memos previously discussed, Meta imposes insurmountable hurdles when it comes to making their existing and in-development products safer, while it imposes no user safety requirements when it comes to making its products more engaging.

148.    Meta is responsible for these harms. These harms are caused by Meta's designs and design-decisions, and not any single incident of third-party content. According to public statements made by the Facebook Whistleblower and other departed Meta employees, Meta's Integrity Team routinely flags these types of issues for Meta leadership and are consistently ignored.

149.    Meta failed to warn minor users and their parents of known dangers arising from anticipated use of its Instagram product. These dangers are unknown to ordinary consumers but are known to Meta and its employees. Moreover, these dangers do not arise from third-party content contained on Meta's social media platform. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Meta,

   a.  Designed and constantly redesigns its Instagram product to attract and addict teens and children, its "priority" user group.

   b.  Designed and continues to operate its Instagram product to ensure that teens and children can obtain unfettered access, even over parental objection.

   c.  Knows when teens and children are opening multiple accounts and when they are

accessing its product excessively and in the middle of the night—which Meta considers to be a "value add proposition."

d.   Works with advertisers and influencers to create and approve harmful content and provides direct access to its "acquired" teens and children—a user population Meta itself recognizes as being "vulnerable."

e.   Operates and provides the above Instagram product with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving algorithm programming that promotes harmful content over clear dangers to user safety.

150.   While it may be a third-party creates a particular piece of harmful content, the teens and children harmed by Instagram are not being harmed by a single piece of harmful content. They are being harmed by Instagram's algorithmic programming and business decisions to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

151.   CN and children like her do not open Instagram accounts in the hopes of becoming addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Instagram and/or secret Instagram accounts, losing control and becoming irritable, and feeling like they want to stop using Instagram but being unable to stop to the point where they continue to keep using even though they want to stop. These and other behaviors can and do result in serious harm to Instagram's minor users.

152.   CN and children like her do not start using Instagram in the hopes of being exposed to product features that cause harm to them. Yet Instagram use involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms Meta itself has acknowledged repeatedly in internal documents.

153.   The harms at issue in this case do not relate to or arise from third party content, but rather, Meta's product features and designs, including algorithms that (a) addict minor users to

Meta's product; (b) amplify and promote harmful social comparison through Instagram product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

154.    Meta's product is addictive on a content neutral basis. Meta designs and operates its algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

155.    Meta has designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Meta's product. This includes but is not limited to Meta's failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts) meant to ensure easy access by children and teens, irrespective of parental consent.

156.    Meta also promotes, encourages, and/or otherwise contributes to the development of harmful content. This Complaint quotes from just a few of the thousands of Meta documents disclosed by the Facebook Whistleblower, which establish this.

157.    Meta also approves ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021,[23]

---

[23] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript

**Senator Mike Lee: (01:21:34)**
Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.

**Senator Mike Lee: (01:22:31)**
I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

158.     In other words, Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers.

159.     Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors."[24] Again, Meta specifically selects and pushes this harmful content, for which it is then paid, and does so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Meta] can push teens into darker and darker places."[25] Meta "knows that its amplification algorithms, things like engagement

---

[24] *See* https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. ("October 5, 2021, Senate Hearing Transcript"), Mr. Chairman Blumenthal at 00:09:02.

[25] *Id.*

based ranking ... can lead children ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[26] Meta has knowledge that its product and the content they are encouraging and helping to create is harmful to young users and chooses "profits over safety."[27]

160.    Meta has information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup. Meta can also determine on a mass scale and with reasonably certainty which of its users are teens, regardless of what information they provide at the time of account setup. Meta has used this capability for its own economic gain.

161.    None of Plaintiffs' claims rely on treating Meta as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold Meta accountable for its own allegedly wrongful acts and omissions, not for the speech of others or for Meta's good faith attempts to restrict access to objectionable content.

162.    Plaintiffs are not alleging that Meta is liable for what the third parties said, but for what Meta did.

163.    None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipated use of its product. Meta could manifestly fulfill its legal duty to design a reasonably safe social media product and furnish adequate warnings of foreseeable dangers arising out of the use of its products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

      a.   Not using its addictive and inherently dangerous algorithm in connection with any account held by a user under the age of 18.

      b.   Not permitting any targeted advertisements to any user under the age of 18.

      c.   Fixing or removing all features that currently do not implement the tools Meta uses

---

[26] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.

[27] *Id.* at 02:47:07.

to identify and remove harmful content (particularly since Meta knows that its algorithms and other systems are pushing these higher risk features disproportionately to protected classes).

d.  Prioritizing internally its removal of harmful content over the risk of losing some user engagement—i.e. users who might be offended when Meta takes down what it believes to be harmful content.

e.  Requiring identification upon opening of a new account, and restricting users under the age of 18 to a single account. This is something teens have even asked Meta to do *for their safety*, "Teens in the UK suggested individuals only be allowed to have one account … some went so far as to recommend the account be verified by a password …" *See, supra*, "Teen Mental Health Deep Dive," p. 55.

f.  Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access Instagram and does not stop bad actors.

g.  Immediate suspension of accounts where Meta has reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments and where Meta determines an "estimated" age of under 13 based on other information it collects; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

h.  Suspension of accounts where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other Instagram users; and not allowing the account to resume until the user provides proof of age and identity

i.  Launching Project Daisy and Pure Daisy, meaning that each user could see their own likes but would be unable to see the likes on any other user's posts and comments.

j.  Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content.

k.  Requiring that all teen user accounts be set to private and not allowing any user

under the age of 18 to change user settings to public.

    l.   Not permitting direct messaging with any user under the age of 18 if that minor user is not already on a user's friend list.

    m.  Requiring parental consent and restricting account access for users under the age of 18 to prevent usage at night and during regular school hours.

164.    These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Meta itself has discussed and considered many of these, but its leadership ultimately declined to make such product changes because such changes—while better for the health and wellbeing of Instagram users—could result in a relatively small decrease to Meta's more than $200 billion in annual revenue.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

165.    CN was born on November 27, 2004, and grew up in Independence, Kentucky.

166.    CN was a vibrant and outgoing child, gifted in language and arts and dedicated to school. CN was often surrounded by friend and was known for bringing happiness and joy to those around her. She was full of life and imagination. She was not sure what she wanted to be when she grew up, sometimes a teacher, sometimes an artist—she had so many ideas of her future.

167.    CN got her first cell phone when she was around 12 years old. She stayed at her father's house part time and Plaintiff Candace Wuest had safety concerns and wanted CN to always be able to reach her if needed.

168.    Candace did not know much about social media at the time, just that it was a way for people to keep up with other people. She was also struggling to make ends' meet, so sometimes got behind on the phone bill—which resulted in occasional breaks in cell service.

169.    Candace looked at Instagram, primarily because it would provide her and CN with a means to stay connected even when their phones were not working. Candace recalls looking into the Instagram product and being impressed with the statements Meta and Meta founder and CEO Mark Zuckerberg made regarding safety and kids. As a hairdresser, Candace also heard a lot about the product from clients. She understood based both on what she read by Meta and heard from others that Instagram was as safe as it gets, kids used it regularly, and that it was not addictive.

170.     Candace made clear to CN that she would always have access to the Instagram account and would monitor it from time to time, which Candace reasonably believed she could do based on what she had read and heard about the Instagram product. That is, Candace did not know about Instagram's addictive design, encouragement of FINSTA and/or SPAM accounts (secret secondary accounts created by kids), social comparison harms caused by Instagram products and algorithms, or harmful recommendation systems and profile/messaging settings.

171.     In 2012, Meta purchased Instagram for $1 billion dollars and began making significant changes to the Instagram social media product. In 2016 alone, Meta made it easier to switch between multiple accounts (February 2016), switched its Feed from chronological to algorithmically-driven (March 2016), and launched of Instagram Stories (August)—a feature Meta designed to be like Snapchat Stories because of Snapchat's success with teens.

172.     Candace was not aware of these specific changes and continued to reasonably rely on Meta's representations that its product was safe and Meta's continued distribution to children and teens. She had no reason to think that Meta was knowingly making and distributing harmful products to anyone, much less to kids.

173.     CN's use of Instagram developed into a dependency on the Instagram product and coincided with a steady, but severe, decline in her mental health.

174.     At first, CN used Instagram to communicate with her mom and find recipes. She frequently messaged Candace recipes for exciting new foods—usually sweets—which they would often make together. CN loved looking for new recipes.

175.     After a while, however, she stopped sending recipes and became preoccupied with the idea that she needed to be slender. By sixth grade, the recipes stopped entirely.

176.     Candace Wuest was unaware of it at the time, but Meta's inherently dangerous algorithms and recommendation systems had escalated CN from delicious recipes to healthy recipes and then to dangerous recipes—for example, recipes designed to achieve negative caloric intake. Meta's inherently dangerous algorithms and recommendation systems began recommending to CN and connecting CN with users, user groups, and content that provided her with tips and tricks on how to hide the fact that she was not eating.

177.    Meta also began flooding CN's Explore page with images of excessively thin models, focusing on thigh gaps, bridge gaps, and clavicle bones. Meta's proprietary algorithms recommended and promoted content with hashtags like #pro-ana and #thinspo. These are not terms CN searched for but, rather, content Meta's recommendation system sent to her. CN would open her Explore page and the content was simply there, in mind blowing volumes.

178.    Meta's social media product pushed 12-year-old CN down a dangerous rabbit hole, which design defects Meta had full knowledge of but failed to correct based on determinations that these design defects were more profitable for Meta if left in place.

179.    The following two photos are ones taken of CN in the summer of 2017, just before seventh grade, and then in August of 2018, when CN started eighth grade,





180.    CN was still a star student in seventh grade, but she also began exhibiting symptoms of anxiety and depression—symptoms Meta has identified as ones that can be caused by use of its Instagram product and ones that were caused by CN's use of its Instagram product. CN became less social and less self-confident. She also started sneaking out of her room at night to get her cell phone. Candace did not allow CN to keep her cell phone with her at night, so she would wait until Candace fell asleep, sneak out and get her phone, stay up all night on social media, and make sure to put her phone back before Candace was awake. Candace caught CN doing this on several occasions and made clear that she could not follow the rules then she would not get to have a phone except when she was at her father's house.

181.    Candace also could not control what happened at CN's father's house and believes that there were not such limits placed on cell phone access.

182.    Unbeknownst to Candace, CN was addicted to Instagram and that addiction was

slowly worsening. Her addiction was resulting in severe sleep deprivation, as well as anxiety, depression, and guilt for her behavior and dependency. Moreover, CN was being harmed by the content Instagram was affirmatively directing her towards via its algorithms and Instagram's social comparison features, such as its "likes" feature.

183.    In seventh grade, CN joined the swim team after realizing that swimming burned a lot of calories. She lost more weight and began restricting her calories even further.

184.    When swimming ended in early 2018, CN began to worry about the reduced exercise and Instagram provided her with solutions. Around this same time, Instagram's algorithms and related technologies began pushing extreme exercise content and recommending user groups—which she joined as a result—focused on extreme exercise and eating disorders.

185.    Meta was identifying and promoting CN toward harmful content through various recommendation mechanisms built into its Instagram product. For example, Meta sent CN recommendations to eating disorder themed pages and groups. Meta also sent CN recommendations for "friends" who were, in fact, adult Instagram users either suffering from these mental health issues themselves or using the Instagram product to find and exploit young girls; and, likewise, Meta recommended CN to these same types of adult users, who then sought to connect with her. As made clear through internal Meta documents, these product features are harmful to a significant percentage of Instagram users, particularly teens and young women

186.    Meta also harmed CN through specific product features like direct messaging and group chat. For example, Instagram's Direct Message and group chat features allowed adult users to message CN directly. As made clear through internal Meta documents, these product features are harmful to a significant number of underage users. They also are not necessary to Instagram's operation and are features Meta can restrict and/or disable—but Meta makes calculated and economic-based decisions to keep them in place because Meta knows that restricting or disabling them would negatively impact engagement and revenue.

187.    Meta was providing CN with constant, harmful access to multiple Instagram accounts, and had designed and was operating Instagram in a manner that ensured that there was nothing CN's mother could do to protect her—in fact, Candace did not even know the source of

the harm, nor could she have discovered it given the degree to which Meta was concealing its findings from the public. Meta did not disclose the fact of its addictive design and its own efforts to addict young children and what it was learning about the harm its specific product features were causing to children and teens—the precise types of harms that were now happening to CN because of Instagram.

188.    Candace Wuest had no way to determine Instagram's role in CN's ongoing but hidden battle with severe depression, anxiety, self-harm, and eating disorders.

189.    In April of 2018, CN stopped menstruating. She did not tell Candace at the time, but she did tell some of the Instagram users Meta had directed her to—who told her that it was a good sign, and she was doing something right. CN was counting every calorie, and making sure she burned more calories than consumed daily,



190.     In August of 2018, Candace took CN clothes shopping. CN had started wearing baggy clothes and had lost enough weight that she needed some new ones. That was when her mom realized something was wrong. Candace was looking around in the department store to find CN and realized that she was looking at her—only, CN looked nothing like she did when she first began using Instagram. She was pale and thin, and almost passed out while shopping.

191.     After shopping Candace took CN to dinner. She had chosen a restaurant that did not list the calories of each food item on the menu, which threw CN into a panic.

192.     The next day, Candace took CN to the doctor. Unfortunately, but the doctor was not alarmed. They reported that CN had lost five pounds since her last visit but was still within the acceptable BMI rate. Candace knew that something was wrong and took CN directly to Cincinnati Children's Emergency Room.

193.     Cincinnati Children's immediately identified the issue quickly, and told Candace that CN was going into heart failure. CN was admitted for anorexia nervosa within about an hour and transferred to Cincinnati Children's Liberty Campus, where she was hospitalized for two and a half weeks.

194.     CN was released from Cincinnati Children's in mid-September 2018. She was only 13 years old at the time.



195.    During treatment, CN wrote the following letter (with corrections),

*Dear Society,*

*You always expect everyone to live up to certain standards. This is not always fair because some people may have more to them under the surface. Ya know? I really think you should take this into consideration. My self-esteem along w/ many others is super low because of you and the images you portray.*

*I can try to improve things like my health, positivity, and faith. Even though I'd love to change my appearance and body, but I think maybe you should change your hearts.*

*I value certain talents I have and I'd like to see those abilities more than just my body and appearance. Please society stop making all these innocent teens and youth want to harm themselves and hurt their mentalities with viscous and cruel lies you stuff their brains with. We are such much more than how we look, act, and abilities*

1    *that aren't useful like modeling or following current trends. You're a real ass*
2    *sometimes!*

3    *Signed,*

4    *CN*





196.    After CN's release from Cincinnati Children's, Candace posted the following to a
Facebook support page,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



4:34 PM

← ed in Candace Wuest's po: ✕

⚙ FILTERS   POSTS YOU'VE SEEN   MOST RECEN

chiropractic, holistic healer, a church congregation laying hands on her and praying, a preist........you name it. Doesn't get better. Only worse. I believe she is getting up at 4am and going to the basement to exercise. She has completely mastered keeping herself at just above hospital weight. She used to be one week with me and one week with her dad due to shared parenting. He has practically given me full custody. I own my own business that generates enough revenue to keep a roof over our heads but that's it. I've taken her to every doctors appointment myself. The specialists want me to take full custody. I can't. I have to work. I have two other children. A son 16 and a 4 year old that is just now in remission from pediatric cancer. I can't do any more than what I'm doing. I've even had her out on a low dose of Prozac in attempts to get a little ahead of things. Nothing is working. Nothing. Her care team is literally stationed at Cincinnati Children's which is the number two pediatric hospital in the country.



This is the picture of "Ed" CN drew,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   197.    And over the next few years, CN expressed her feelings through her art,

18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





198.   But for Meta's misrepresentations and material omissions relating to the safety of its social media product and its use of technology to protect young users, CN would not have been exposed to Instagram's features and design.

199.   But for Meta's likes feature and other harmful social comparison product features, CN would not have experienced the anxiety and depression that stem from the number of likes collected and Meta's amplification of social comparison content.

200.   But for the endless feed and explore features, along with other product design features Meta has engineered to product dependency by its users and, especially, its youngest users, CN would not have experienced the clinical addiction that these features were designed to promote.

201.   But for Meta's recommendation and content algorithms, and profile settings and direct messaging features, CN would not have been connected and exposed to adult users who encouraged and helped her hide her life-threatening eating disorder from her mother.

202.   Starting in 2016, Meta's algorithm exposed CN to massive amounts of eating

disorder and other unhealthy content, including pro-ana content, as well as social comparison product features. CN began using Instagram more. She received recommendations for pro-ana groups and content to follow and spent hours looking at that content. CN started by eating healthier, then eating less and exercising more, fueled on by the images that Meta's algorithm bombarded her with in her Feed, Stories, and Explore. She began thinking that she wasn't good enough, and that she needed to look like the models she saw on Instagram.

203.   CN also got anxious and depressed every time she tried to post something on her account, afraid that it wouldn't get enough likes and, as time went on, she began to feel worse and worse about herself. She obsessed over likes every time she posted. Often her day and her mood turned on those posts and how much people liked them, which eventually destroyed her confidence and self-esteem both on Instagram and in the world outside of Instagram.

204.   Through her use of Instagram CN also received explicit sexual communications and images from adult users and was messaged and solicited for sexual exploitive content and acts on numerous occasions by adult users of Instagram. These adult users are encouraged to use Instagram to sexually solicit and abuse minors due to Meta's refusal to verify identity and age for new users or implement feasible safeguards to protect minor users from receiving inappropriate sexual content.

205.   At all times relevant, Meta knew that some of its Instagram users would become addicted to Instagram (or, in Meta's words, would engage in "problematic use"). Meta also knew that children and teenagers would be particularly susceptible, and Meta knew or should have known what an addiction like this would do those children and teenagers and their families. But Meta didn't care. For years, Meta has been conducting studies meant to help increase usage and dependency by children under 13, like CN.

206.   CN was dependent on Instagram and could not stop using Instagram, even when the social media product was directing increasing amounts of harmful content and amplifying that harmful content via CN's Instagram accounts and product features. CN was repeatedly bombarded with and exposed to content identified and recommended to her by Meta, which increasingly included underweight models, unhealthy eating, and eating disorder content.

207.    In fact, Meta worked hard to develop and implement technologies and features designed to increase engagement (and its own profits) but which were harmful to users. To name only a few examples, from 2012 through 2015, Meta implemented new advertising features, which allowed advertisers to target users based on age, location, gender, and other characteristics. Meta failed to exercise reasonable care to ensure that the advertisements were safe. Meta profited from its advertising practices and product features, while CN was exposed to and harmed by harmful advertising content created and/or selected by Meta for her viewing. Meta also made changes in February 2016, to make it easier for Instagram users to easily switch between multiple accounts. CN opened FINSTAs (secret Instagram accounts) and Meta exposed CN to addictive design, harmful advertising, and other, Meta-backed content through those accounts as well. And in March 2016, Meta switched its feed from chronological to algorithm-driven ordering. Which meant that, by the time CN began using its Instagram product, Meta was identifying, prioritizing, and escalating certain posts and content in CN's Instagram feed. More specifically, it identified, promoted, and prioritized harmful content based on its determination that such content was more likely to keep CN's attention, thereby increasing her use of its product and resulting revenue.

208.    The more CN accessed and used the Instagram social media product, the worse her mental and physical health became.

209.    Over the last four years, Plaintiffs CN and Candace Wuest have survived 10 hospitalizations, including one residential stay and two active suicide attempts, because of Instagram's inherently harmful and dangerous social media product. During CN's multiple hospitalizations and one long term residential stay, she had to be "tubed" multiple times. She refused to eat to the point where a feeding tube was necessary. And when she tried to eat, CN felt so much anxiety and guilt that she would engage in self-harm. To this day, her arms, stomach, legs, and ankles are scarred with those markings of suicidal ideation and self-injury – what Meta refers to internally as "SSI," an injury Meta knows it is causing to young girls like CN.

210.    CN's honor roll status and dreams for her future became a distant memory. CN's eating disorder resulted in significant loss of muscle and parts of her brain. It was not until very recently that CN got back to the point where she could be trusted to feed herself, that is, her mother

will ask her to go get a meal and she will. It was not until very recently that CN could focus long enough to sit down and read a book. Plaintiffs' lives have gone from planning for the future to surviving day-to-day.

211.    CN is aware of the challenges ahead and works hard every day to not slip back into her eating disorder.

212.    CN's addiction and resulting mental health disorders were the proximate result of the unreasonably dangerous Instagram product Meta made accessible to her and that she used. As set forth in detail below, Meta's products were not reasonably safe due to their defective design and inadequate warnings.

213.    To this day, Meta has actively concealed the fact and has "sought to stonewall and block this information [information about the dangerousness of their products, especially to young users] from becoming public."[28] Meta "intentionally"[29] hid vital information in its possession from the public, the US government, and governments, including information relating to the safety of children and the role of its algorithms and other Instagram product features in causing addiction, depression, anxiety, eating disorders, and other harms.

214.    Meta made false statements to the press and public, designed to cover up the inherent dangers of their products and, even when asked direct questions as to how those products "impact the health and safety of our children, they choose to mislead and misdirect."[30]

215.    Plaintiffs did not discover, or in the exercise of reasonable diligence could not have discovered, that CN's addiction, depression, anxiety, self-harm, eating disorders, attempted suicides, and other harms were caused by Meta's unreasonably dangerous products until early 2022, when Candace found out about the Facebook whistleblower and disclosed Meta documents.

216.    CN disaffirms all contracts Instagram may purport to have with her and is no longer using Instagram.

217.    In the eighth grade CN wrote an essay that got her accepted into a new concepts

---

[28] October 5, 2021, Senate Hearing Transcript, Mr. Chairman Blumenthal at 00:05:21.

[29] *Id.* at 00:29:25.

[30] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen, at 00:32:20.

high school in Kentucky, Ignite, which enables students to graduate high school with an Associate Degree. As a result of CN's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, CN's had to leave Ignite and her life-long honor roll track record has become Ds and Fs.

218.    As a result of CN's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, CN also had to undergo professional counseling, inpatient programs, outpatient programs, and eating disorder programs. CN must stay in constant contact with doctors and dieticians, fights to stay in recovery every day, and will suffer permanent mental and emotional damages because of what Instagram has done.

219.    As a result of CN's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, CN developed a brain condition known as prolactinoma.

220.    Meta was studying the brains of children and teens. CN was just another brain to Meta, resulting in her own MRI and diagnosis.



221.    While the precise long-term impacts CN's diagnosis are not yet known, common outcomes include infertility, low sex drive, and painful intercourse. Upon information and belief, CN's condition was caused by medications made necessary because of the impact on CN's brain of her Instagram-caused eating disorder

222.    These harms are a direct and proximate result of the social media addiction Instagram fostered and encouraged for its own financial gain and harms that resulted therefrom.

223.    But also, Candance Wuest has suffered medical conditions as a direct result of the social media addiction Meta fostered and encouraged for its own financial gain and harms that resulted therefrom. This includes a stress-related skin condition Candace developed on her hands, dyshidrotic eczema.



224.    Candace first developed this condition in the winter of 2020, when CN returned from residential treatment and then relapsed. At first it was bearable, but after CN attempted suicide in December 2021, it flared out of control and Candace was forced to take time off work.

If Candace did not own her own salon, she would have been out of a job. As it is, however, she has lost significant income because of this condition and, if she cannot get it under control, it could jeopardize her business and career.

225.    Candance Wuest has suffered other, severe financial harms as a direct result of the social media addiction Meta fostered and encouraged for its own financial gain and harms that resulted therefrom as well. For example, in the Spring of 2019, CN needed treatment not available in Kentucky, forcing Candace to find out-of-state options. Candace scoured the options and found a location as close to Kentucky as possible—in Durham, North Carolina. From April 2019 through July 2019 Candace flew to Durham every other weekend to help with her daughter's treatment and recovery. She had to cash in her stocks and savings and stayed at a Ronald McDonald House while in Durham because she could not afford a hotel. During this time, she lost the value of those stocks and savings, but also, lost income and her business suffered.

226.    Candace has done everything she can to help keep CN alive, and what the Instagram product has done to her daughter has taken an incredible emotional, financial, and physical toll on her life, as one would expect and as Meta could and should have anticipated.

## VI.    PLAINTIFFS' CLAIMS

## COUNT I – STRICT PRODUCT LIABILITY (Design Defect)

227.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 226 as if fully stated herein.

228.    Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

229.    Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's product causes mental and physical

harm to minor users.

230.    Meta's product was unreasonably dangerous because it contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Meta solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on its product.

## A.    Inadequate Safeguards from Harmful and Exploitative Content

231.    As designed, Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Meta's social media product. The cost of designing Meta's algorithms to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

232.    Meta also engages in conduct, outside of the algorithms themselves, that is designed to promote harmful and exploitative content as a means of increasing its revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Meta at the direct cost of user wellbeing.

233.    Reasonable users (and their parents) would not expect that Meta's product would knowingly expose them to such harmful content and/or that Meta's product would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Meta has and continues to knowingly use its algorithms on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Meta's youngest users, like CN.

**B.**     **Failure to Verify Minor Users' Age and Identity**

234.     As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

235.     Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

236.     Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

237.     Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Meta's product often open multiple accounts, such that Meta knows or has reason to know that the user is underage and/or does not have parental permission to use its product. Meta already has the information and means it needs to ascertain with reasonable certainty each user's actual age and, at least in some cases, Meta utilizes these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply choose to do nothing about that information as it relates to the specific, underaged users themselves.

238.     By way of example only, Meta has dashboards that enable it to identify and track every detail of user activity by date, location, and age—not the age provided to Meta upon account opening, but rather, "Age prediction" technologies Meta has developed and that can determine age with reasonable certainty based on user data, online activity, and/or similar sources of information Meta collects with regard to every Meta user on a constant and ongoing basis.

239.     Again, Meta exercises an unprecedented level of control over its users and possesses and unprecedented level of knowledge—including the estimated actual age of each user, irrespective of what a user states when opening an account. Meta cannot, in good faith, disclaim knowledge or responsibility for the harms its social media product is causing, including the harms it caused to CN and that are at issue in this Complaint.

240.     Moreover, reasonably accurate age and identity verification is not only feasible but

widely deployed by online retailers and internet service providers.

241.    The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C.    Inadequate Parental Control and Monitoring**

242.    Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

243.    Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.    Intentional Direction of Minor Users to Harmful and Exploitative Content**

244.    Default "recommendations" communicated to new teenage users, including CN, purposefully steered her toward content Meta knew to be harmful to children of her age and gender.

245.    Ad content pushed to new teenage users, including CN, because of their age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to children of their age and gender.

**E.    Inadequate Protection of Minors from Sexual Exploitation and Abuse**

246.    Meta's product is not reasonably safe because it does not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

247.    Parents do not expect their children will use Meta's product to exchange sexually explicit content and images, and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

248.    Minor users of Meta's product lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline invitations to exchange salacious material.

249.     Meta's product is unreasonably dangerous and defective as designed because it allows minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Meta's integrated design features.

**F.     Design of Addictive Social Media Products**

250.     As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

251.     Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

252.     Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity

modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

253.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is.  Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

254.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction.  Originally designed for Facebook, BFAS has since been generalized to all social media.  BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

255.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

    a.   You spend a lot of time thinking about social media or planning how to use it.

    b.   You feel an urge to use social media more and more.

    c.   You use social media in order to forget about personal problems.

    d.   You have tried to cut down on the use of social media without success.

e.   You become restless or troubled if you are prohibited from using social media.

f.   You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

256.   Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

257.   Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when the device is taken away or access is not possible (sadness, anxiety, irritability), including,

a.   Tolerance, the need to spend more time using social media to satisfy the urge.

b.   Inability to reduce social media usages, unsuccessful attempts to quit gaming.

c.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

d.   Continuing to use social media despite problems.

e.   Deceiving family members or others about the amount of time spent on social media.

f.   The use of social media to relieve negative moods, such as guilt or hopelessness.

g.   Jeopardized school or work performance or relationships due to social media usage.

258.   Meta's advertising profit is directly tied to the amount of time that its users spend

online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

259.    It is feasible to make Meta's product less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

260.    At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

261.    Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

262.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

263.    Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

264.    Meta's entire business is premised upon collecting and analyzing user data and it is

feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation and abuse by adult users.

265.    Moreover, it is reasonable for parents to expect that platforms such as Instagram, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

266.    As a proximate result of these dangerous and defective design attributes of Meta's product, CN suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until 2022.

267.    As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs CN and Candace Wuest, have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from her social media addiction.

268.    Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

269.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 268 as if fully stated herein.

270.    Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Plaintiffs' injury.

271.    Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Instagram.

272.    Meta's social media product relies on highly complex and proprietary algorithms

that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

273.    The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

274.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms.

275.    Meta's product is unreasonably dangerous because it lacks any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

276.    It is feasible for Meta's product to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

277.    Meta knew about these harms, knew that users and parents would not be able to safely use its product without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

278.    As a result of Meta's failure to warn, CN suffered severe mental harm, leading to physical injury from her use of Instagram.

279.    As a result of Meta's failure to warn, Plaintiffs CN and Candace Wuest, have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

280.     Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT III – NEGLIGENCE

281.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 280 as if fully stated herein.

282.     At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as CN.

283.     Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

284.     As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

285.     As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

286.     Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like CN, using its Instagram product.

287.     Meta was negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst teenage users. Meta has extensive internal research indicating that its product is harmful, causes extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

288.     Meta is negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

289.     Meta is negligent in failing to fully assess, investigate, and restrict the use of Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram product.

290.     Meta is negligent in failing to provide users and parents the tools to ensure its social media product is used in a limited and safe manner by underage users.

291.     As a result of Meta's negligence, CN suffered severe mental harm from her use of Instagram.

292.     As a result of Meta's negligence, Plaintiffs CN and Candace Wuest have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

293.     Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including CN, whom they knew would be seriously harmed through the use of its social media product.

**COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

294.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 293 as if fully stated herein.

295.     Defendant Meta is a corporation, and thus a "person," as defined by California Business & Professions Code § 17201.

296.     The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

297.     Defendant's conduct is unlawful as set forth in Counts I–III, above.

298.     Defendant's conduct is unlawful also because it has knowledge of users under the age of 13 on its platform and, in fact, actively targets, markets to, and encourages use of its social media product by minors under the age of 13.

299.     Defendant engaged in fraudulent and deceptive business practices in violation of

the UCL by promoting products to underage users, including CN, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendant knew and should have known that its statements and omissions regarding the addictive and harmful nature of its product were misleading and therefore likely to deceive the members of the public who use Defendant's product and who permit their underage children to use Defendant's product. Had Candace Wuest known of the dangerous nature of Defendant's product, they would have taken early and aggressive steps to stop or limit their daughter's use of Defendant's product.

300. Defendant's practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

301. Defendant's conduct has resulted in substantial injuries that Plaintiffs could not reasonably have avoided because of Defendant's deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

302. As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendant has also obtained an unfair advantage over similar businesses that have not engaged in such practices.

303. As a result of Defendant's UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

304. Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

## COUNT V – UNJUST ENRICHMENT

305. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 304 as if fully stated herein.

306. As a result of Defendant's conduct detailed herein, Defendant received a benefit. Because Defendant's advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendant benefited directly from CN's

problematic use of its product, both from the amount of time she spent on Instagram and from her creation of multiple Instagram accounts.

307.   It would be unjust and inequitable for Defendant to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendant's acts and omissions described herein.

308.   Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

309.   Plaintiffs reallege each and every allegation contained in paragraphs 1 through 308 as if fully stated herein.

310.   Defendant intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

311.   These intrusions are highly offensive to a reasonable person, particularly given Defendant's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

312.   Plaintiffs were harmed by Defendant's invasion of privacy, as detailed herein.

313.   Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendant to cease the harmful practices described throughout this complaint.

## COUNT VII – FRAUD AND FRAUDULENT CONCEALMENT

314.   Plaintiffs reallege each and every allegation contained in paragraphs 1 through 313 as if fully stated herein.

315.   At all times relevant, Meta designed, developed, operated, marketed, made publicly available, and benefitted from its Instagram social media product and therefore owed a duty of reasonable care to avoid causing harm to those that it used it.

316.   Defendant's marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the Instagram product was safe, improved social connectivity, and improved the mental and physical health of its users. For

example, in April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[31]

317.   In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[32]

318.   In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.[33]

319.   On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive[34] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[35]

320.   On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive[36] and he downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's

---

[31] https://www.youtube.com/watch?v=AB4mB-K7-xY

[32] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[33] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[34] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[35] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[36] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[37] He testified that Meta's overarching goal is child safety.[38]

321.    Meta's Terms of Use also represent that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure."

322.    The above statements are indicative and reflective of the deceptive and/or misleading statements Meta has been feeding to the general public for years in order to convince people that its products were safe for use by teenagers, like CN. When in fact, Meta knew that its products were not safe. Meta knew that its products are addictive and harmful to a significant portion of users, including teen girls, like CN.

323.    Meta's public statements and other marketing and advertising materials failed to disclose the truth, in fact, Meta has gone to considerable lengths to conceal the truth. This includes creating a corporate culture that convinced thousands of Meta employees that if they went public with what they knew they would lose their careers, no one would believe them, and that Meta would then lock down internal communications in a manner that would make it impossible for the employees left behind to work toward effectuating change from the inside. When in fact, Meta never intended to allow change from the inside. It intended to pursue engagement and growth at the expense of human lives and did everything it could to hide these facts from the world.

324.    Meta lied about the harm its products are causing.

325.    Meta's omissions were also misleading and deceptive in every respect, for example, talking about how Instagram makes some users' lives better and ignoring the fact that Instagram is causing serious harms to other users, including but not limited to what Meta calls SSI, Suicide and Self-Injury. Meta failed to disclose, and spent years actively concealing, the fact that its social

---

[37] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[38] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

media products cause addiction, sleep deprivation, anxiety, depression, anger, eating disorders, self-harm, suicidal ideation, and suicide, among other harms.

326.    These representations were false and material, as were Meta's omissions. These representations were communicated to Plaintiffs via the media, the internet, advertising, websites, and the platforms themselves and Plaintiffs reasonably relied on these representations to their detriment. Meta intended for members of the general public, including Plaintiffs, to rely on these misrepresentations and omissions, and Plaintiffs did, and these misrepresentations and omissions were a substantial factor in causing Plaintiffs' harm.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Meta for monetary damages for the following harm:

1.  Past physical and mental pain and suffering of CN, in an amount to be more readily ascertained at the time and place set for trial.

2.  Loss of future income and earning capacity of CN.

3.  Past and future medical expenses of CN.

4.  Past physical and mental pain and suffering of Candace Wuest, in an amount to be more readily ascertained at the time and place set for trial.

5.  Monetary damages suffered by Candace Wuest.

6.  Punitive damages.

7.  For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8.  For injunctive relief.

9.  For such other and further relief as this Court deems just and equitable.

DATED this 25th day of July 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone: (206) 294-1348

Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

Attorneys for Plaintiffs